No. 431 June 26, 2024 453

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of A. M.,
a Person Alleged to have Mental Illness.

STATE OF OREGON,
*Respondent,*

*v.*

A. M.,
*Appellant.*

Clackamas County Circuit Court
23CC03225; A181716

Susie L. Norby, Judge.

Argued and submitted May 15, 2024.

Christopher J. O'Connor argued the cause for appellant. Also on the brief was Multnomah Defenders, Inc.

Gregory A. Rios, Assistant Attorney General, argued the cause for respondent. Also on the brief was Ellen F. Rosenblum, Attorney General and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, Jacquot, Judge, and Kistler, Senior Judge.

KISTLER, S. J.

Judgment vacated; remanded for further proceedings.

## KISTLER, S. J.

The trial court committed appellant to the custody of the Mental Health Division for a period not to exceed 180 days after finding that she suffered from a mental disorder and posed a danger to others. On appeal, appellant raises three assignments of error. Her first two assignments of error focus on the trial court's rulings denying her motions for an in-person commitment hearing. Her third assignment of error is directed at the trial court's finding that she posed a danger to others. We vacate the trial court's judgment and remand this case for further proceedings.

On March 11, 2022, the Presiding Judge of Clackamas County entered an order providing that all civil commitment hearings in the county will "be held remotely."[1] More than a year later, the trial court ruled that there was probable cause to civilly commit appellant and set a date for a remote hearing to decide whether clear and convincing evidence established that she should be civilly committed. Approximately a week before the hearing, appellant filed a motion requesting an in-person hearing and challenging the Presiding Judge's March 11, 2022, order. She argued that a remote hearing violated state statutes limiting the use of remote testimony and, alternatively, denied her due process.

Appellant's motion described the way that remote civil commitment hearings are conducted in Clackamas County and the difficulties that, in appellant's view, such hearings pose. It identified various state statutes that, as a general rule, require in-person testimony or assume that the courts will hold in-person civil commitment hearings. The motion also set out appellant's due process arguments. At the end of her motion, appellant's counsel represented that she had spoken with the district attorney's office, which took no position on her motion.

The trial court did not hold a hearing on appellant's motion. Rather, the day after she filed her motion, the court entered an order denying the motion "pursuant to [the March 11, 2022, Presiding Judge order]." Later, at the beginning of her

---

[1] The March 11, 2022, order provides that it "will remain in effect until amended, superseded, or vacated by further order."

commitment hearing, appellant renewed her motion for an in-person hearing, which the trial judge denied. The trial judge explained that, although she found appellant's arguments "exceedingly compelling," "we've had a discussion among all of the judges [in Clackamas County] about what the legal arguments are in favor of and against [appellant's position]. And we allowed the majority of judges to prevail." Appellant's commitment hearing accordingly proceeded remotely.

Some of the procedural details of that hearing can be gleaned from the transcript. Every person who participated in the hearing appeared remotely—appellant, the judge, the lawyers, the examiners, and the witnesses. The trial judge noted that each person's image was visible on her computer monitor as a separate "tile," although the record does not disclose how many tiles the judge's monitor could display simultaneously, how large each tile was, or whether each tile provided only a limited view of each participant. Each participant appears to have been at a separate location, with one exception. The trial court made a remark at one point in the hearing that revealed that appellant and her counsel were together apparently in the room where appellant was hospitalized.

The record does not disclose whether the various participants in appellant's hearing used laptops, smart phones, or other devices to take part in the hearing, nor does it disclose whether the use of different devices or the lighting at each location affected the clarity of the images transmitted to the other participants. Occasionally, a participant stated that he or she was having difficulty hearing what another participant said. When that occurred, the trial judge was careful to remedy any limitation on the participants' ability to hear each other.

The testimony at appellant's hearing consisted of expert and fact witnesses. The state called a psychiatrist who testified that appellant suffers from a schizoaffective disorder, which can result in her experiencing delusions. Most of the testimony, however, centered on the factual question whether appellant posed a danger to others. An FBI agent explained that appellant repeatedly had threatened the FBI because she believed it was altering her social media accounts. He testified that, in response to appellant's threats of violence, the FBI

took a series of graduated steps to dissuade her from contacting them. Among other things, the FBI prohibited her from coming on its property, and it asked the Multnomah County District Attorney's office to prosecute her for trespassing when she violated that prohibition. The FBI agent testified that those graduated steps did not prove successful and that appellant's threats appeared to be escalating. Specifically, after threatening to hit an FBI agent with a baseball bat, appellant arrived at the FBI offices where a small bat was found in her car.

Appellant also testified. She explained that she carried the bat for her own protection and that she had no intention of harming anyone with it. The psychiatrist who examined appellant supported her position; he testified that, in his opinion, appellant was unlikely to act on her threats and recommended against commitment. After considering that evidence, the trial court found that taking the bat to the FBI office, coupled with appellant's threats of violence, was "a step too far." The court found that appellant suffered from a mental illness and posed a danger to others. Based on those findings, the court entered a judgment committing appellant to the custody of the Mental Health Division for a period not to exceed 180 days.

Appellant's first two assignments of error challenge the trial court's rulings denying her motion for an in-person hearing.[2] As noted, both rulings were based on the Presiding Judge's March 11, 2022, order. Appellant notes initially that the Presiding Judge's order requires that all civil commitment hearings in Clackamas County be conducted remotely,

---

[2] We also address appellant's third assignment of error briefly. Setting aside any procedural issues, we conclude that there is evidence in the record to support the trial court's finding that appellant poses a danger to others. *See State v. J. D. S.*, 242 Or App 445, 447, 263 P3d 1017 (2011) (stating the standard of review). We note initially that, although appellant had made violent threats against others in the past, she had not, as a general rule, become physically violent. However, a year earlier she had bitten an emergency medical technician's arm when he sought to conduct a wellness check, and she hit a nurse in the chest. Moreover, a witness testified that appellant's threats had recently begun to escalate, that she had threatened to hit a person at the FBI with a baseball bat, that she had driven that day to the FBI office where she had been arrested, and that an agent had found a bat in her car when he checked it before allowing her access to the car to retrieve her phone. Given the escalation in appellant's threats, her delusional thinking, and the fact that she put herself in a position to carry out her most recent threat to cause physical harm, we conclude that the record supports the trial court's factual finding.

without regard to whether there is a particularized need for all or even any of the participants in the hearing to appear remotely. In appellant's view, the order indiscriminately requires remote testimony in violation of state statutes and the Due Process Clause of the Fourteenth Amendment.[3]

We begin with appellant's statutory argument. Some of the statutes on which appellant relies limit the use of remote testimony. *See, e.g.*, ORS 45.400(3) (permitting a witness to testify remotely only when good cause is shown and, among other things, the ability to evaluate the credibility and demeanor of the witness is not critical to the proceeding). Other statutes provide that the trial court may hold a civil commitment hearing where the person who allegedly is mentally ill is housed and thus assume an in-person hearing. *See* ORS 426.095(1); *State v. G. N.*, 230 Or App 249, 256, 215 P3d 902 (2009) (concluding that the trial court abused its discretion in applying ORS 426.095(1) when it held a civil commitment hearing at the courthouse but required the allegedly mentally ill person to appear remotely, without any apparent reason for not transporting him to the courthouse).[4]

The state does not dispute that, if those statutes applied, the Presiding Judge's order would be invalid. The state notes, however, that ORS 1.002(5), as amended in 2021, delegated authority to the Chief Justice of the Oregon Supreme Court to permit remote testimony in Oregon courts during a period of statewide emergency, and it did so "[n]otwithstanding any other statute or rule to the contrary." ORS 1.002(5)(c)(A) (2021), *amended by* Or Laws 2022, ch 68, § 8, Or Laws 2023, ch 133, § 1.[5] The state also notes that the

---

[3] As we understand appellant's argument, she does not contend that every participant in a civil commitment hearing must always appear personally; rather, she argues that she is entitled under state statutes and the federal constitution to an in-person hearing but that individual witnesses can appear remotely if a particularized need warrants such testimony. *See* ORS 45.400(3) (describing categorically when remote testimony is and is not permitted).

[4] Appellant argues that ORS 426.095(1), properly applied, should have led to her civil commitment hearing being held at the hospital where she was detained rather than the courthouse. The question, however, where an in-person commitment hearing should be held is secondary to the question whether appellant was entitled to an in-person hearing at all.

[5] ORS 1.002(5)(c)(A) (2021) provided:

"Notwithstanding any other statute or rule to the contrary, during a period of statewide emergency, the Chief Justice may direct or permit any appearance

Chief Justice delegated that authority to the presiding judge of each judicial district, Chief Justice Order (CJO) 21-025 at 6, and that the Presiding Judge in Clackamas County issued the March 11, 2022, order pursuant to that delegation. It follows, the state reasons, that the Presiding Judge's March 11, 2022, order providing that all civil commitment hearings will be heard remotely necessarily supersedes the statutes on which appellant relies.

As the state also notes, the 2022 legislature amended ORS 1.002(5)(c)(A) (2021) by removing the restriction that the Chief Justice could permit remote testimony only during a period of statewide emergency. *See* Or Laws 2022, ch 68, § 8, *codified as* ORS 1.002(5)(a). Following that amendment, the Chief Justice issued updated Chief Justice orders that superseded the 2021 Chief Justice Order on which the Presiding Judge relied in issuing the March 11, 2022, order. *See* CJO 22-012 at 8; CJO 23-028 at 4. Each updated order consists of two sections. The first section recites the history that preceded the order; the second sets out the operative terms of the order. *See* CJO 22-012; CJO 23-028.

In the first section of CJO 22-012, the Chief Justice explained that, during the statewide emergency precipitated by COVID-19, the Oregon courts gained significant experience using remote testimony, and they recognized that remote testimony can increase Oregonians' access to justice "notwithstanding work and childcare schedules that conflict with courthouse hours; limited access to public transit in some communities; [and] disabilities that make travel to the courthouse difficult." CJO 22-012 at 2. The order also notes that, although the statewide emergency resulting from COVID-19 had ended, the 2022 legislature amended ORS 1.002(5) to permit the Chief Justice to continue the use of remote testimony. *Id.*

Based on those recitals, the second section of CJO 22-012 sets out the operative terms of the order. CJO 22-012 at 4. It provides that, "[c]ircuit court proceedings may be conducted in person or by remote means, as determined by

---

before a court or a magistrate to be by telephone, other two-way electronic communication device or simultaneous electronic transmission."

Or Laws 2021, ch 199, § 1(5)(c)(A).

the Presiding Judge." *Id.* It specifies that the authority delegated to the presiding judges supersedes statutes and rules requiring in-person testimony. *Id.* And it recognizes that the statutory authority delegated to the presiding judges to permit remote testimony must give way to a litigant's constitutional right to in-person testimony. *Id.* Finally, the order authorizes litigants who believe that remote testimony violates their rights to file motions raising that claim. *Id.*

On appeal, appellant does not contend that the Presiding Judge lacked authority to issue the March 11, 2022, order, nor does she argue that the order is no longer in effect as a result of either the 2022 amendment to ORS 1.002(5) or the updated Chief Justice's orders issued pursuant to the 2022 amendment. In the absence of any argument that the March 11, 2022, order is no longer valid, we agree with the state that the March 11, 2022, order supersedes the statutory authority on which appellant relies and turn to appellant's due process claim.

The parties offer competing views of what due process requires. The state argues that we should evaluate the three factors set out in *Mathews v. Eldridge*, 424 US 319, 335, 96 S Ct 893, 47 L Ed 2d 18 (1976), to determine what process is due when the state seeks to civilly commit a person. As we understand the state's argument, it turns primarily on the second *Mathews* factor. The state reasons that, given the nature of the factual issues a civil commitment hearing entails, there is no constitutionally meaningful difference between the remote hearing in this case and an in-person hearing; that is, the state argues that the technology available in appellant's hearing did not limit appellant's participation in her civil commitment hearing in any constitutionally significant way.

Appellant offers two related but separate responses. She notes initially that, after balancing the three *Mathews* factors, the Court held in *Addington v. Texas*, 441 US 418, 433, 99 S Ct 1804, 60 L Ed 2d 323 (1979), that due process requires greater procedural protections for persons facing civil commitment than the procedural protections that ordinarily apply in civil cases. She concludes that the Presiding Judge's March 11, 2022, order strikes precisely the opposite balance: It requires that civil commitment hearings be

conducted remotely while permitting in-person hearings in ordinary civil cases. Alternatively, appellant relies on *State v. O'Neill*, 274 Or 59, 545 P2d 97 (1976), and *State v. T. C.*, 327 Or App 558, 536 P3d 591 (2023), *rev den*, 371 Or 825 (2024), for the proposition that due process requires in-person civil commitment proceedings.

We begin with appellant's alternative argument. If, as she contends, the Oregon courts have already decided that due process requires in-person civil commitment hearings, we need not undertake our own evaluation of the three *Mathews* factors. As we understand appellant's alternative argument, it runs as follows. She contends that ORS 426.095(1) requires in-person civil commitment hearings. She also contends that both *O'Neill* and *T. C.* establish that civil commitment hearings will comply with due process only if they strictly follow the procedures set out in ORS 426.095. It follows from those two propositions, she reasons, that due process requires in-person civil commitment hearings.

The premises on which appellant's argument rests are questionable. ORS 426.095(1) does not expressly require an in-person hearing, although it may assume one.[6] Moreover, we did not hold in *G. N.* that ORS 426.095(1) requires an in-person hearing; rather, we held that, given the information before it, the trial court abused its discretion in requiring the appellant to participate remotely in his civil commitment hearing. *See* 230 Or App at 256. *G. N.* left open the possibility that the trial court permissibly could have reached a different conclusion in other circumstances. Finally, we question whether appellant reads *O'Neill* and *T. C.* more broadly than those decisions warrant.

In our view, another line of authority provides firmer support for appellant's position.[7] In *Vitek v. Jones*, 445 US 480, 494-96, 100 S Ct 1254, 63 L Ed 2d 552 (1980), the United States Supreme Court agreed that due process requires "an opportunity to be heard in person" before a person can be

---

[6] ORS 426.095(1) provides that a civil commitment "hearing may be held in a hospital, the person's home or some other place convenient to the court and the person alleged to have a mental illness."

[7] The state commendably brought this line of authority to our attention in its answering brief.

civilly committed.[8] At first blush, *Vitek* appears dispositive. The difficulty, however, with *Vitek* is that the technology available in this case did not exist in 1980 when *Vitek* was decided. For all that appears from *Vitek*, no one argued that a remote civil commitment hearing, much less a remote civil commitment hearing using the technology now available, would comply with due process. We decline to read *Vitek* as deciding a question that no one asked and the Court never answered. Appellant's reliance on *O'Neill* and *T. C.* suffers from the same problem.[9]

We also consider appellant's initial due process argument. If the reasoning in *Addington* controls this case, as appellant argues, then we need not rebalance the *Mathews* factors to decide whether a remote civil commitment hearing complies with due process. The procedural due process question in *Addington* was whether due process requires proof beyond a reasonable doubt in civil commitment hearings. *See* 441 US at 427. Balancing the *Mathews* factors, the Court held that due process requires proof by clear and convincing evidence—the midlevel standard of proof between proof beyond a reasonable doubt and proof by a preponderance of the evidence. *Id.* at 432-33. The difficulty with appellant's reliance on *Addington* is that different procedural protections in a civil commitment hearing can impose different costs on the government and provide different contributions toward reaching an accurate result. *Cf. Wolff v. McDonnell*, 418 US 539, 563-70, 94 S Ct 2963, 41 L Ed 2d 935 (1974) (separately analyzing a range of procedural protections in prison disciplinary hearings based on the benefits and burdens each procedure entailed). We cannot automatically translate *Addington*'s holding on the

---

[8] In *Vitek*, the state sought to transfer an inmate from prison to a mental hospital based solely on a doctor's opinion that the inmate suffered from a mental illness that could not properly be treated in the prison. *See* 445 US at 483-85. In considering what process was due before the inmate could be transferred, the Court held that the district court appropriately concluded that due process required, among other things, "the opportunity to be heard in person" before being transferred. *Id.* at 494-96.

[9] Neither *O'Neill* nor *T. C.* considered whether due process precludes the state from conducting civil commitment hearings remotely. Indeed, neither case specifically addressed whether due process requires that civil commitment hearings be held in person rather than remotely. They provide no more support for appellant's argument than *Vitek* does.

applicable standard of proof into a requirement for in-person hearings, as appellant would. The two procedural protections raise separate due process issues.

This is not to say that *Addington* and *Vitek* have no bearing on the due process issue that appellant raises. Their analysis of the private interest at stake in civil commitment hearings is controlling, as we discuss below. Moreover, *Vitek* is relevant in another respect. By recognizing that due process requires an "opportunity to be heard in person" before being civilly committed, *Vitek* identifies the standard that a remote civil commitment hearing must meet to comply with due process; that is, *Vitek* makes clear that a remote hearing must provide the same or equivalent procedural protections as an in-person hearing to survive a procedural due process challenge.

Because the existing cases do not resolve the due process issue that appellant raises, we turn to the methodology that the United States Supreme Court has identified for deciding that issue. When the state impairs a liberty or property interest protected by the Due Process Clause, the question of what process is due turns on an evaluation of "three distinct factors":

> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*Mathews*, 424 US at 335. The record in this case permits us to assess the first and third *Mathews* factors, and we begin by discussing them.

The first *Mathews* factor is the "private interest that will be affected by the official action." *Id.* Appellant argues, and the state does not dispute, that the private interest affected by an involuntary civil commitment is "significant." *Addington*, 441 US at 425. In Oregon, a person who is civilly committed can be involuntarily confined for medical treatment for up to 180 days. As the Court has observed, "for

the ordinary citizen, commitment to a mental hospital produces 'a massive curtailment of liberty.'" *Vitek*, 445 US at 491 (quoting *Humphrey v. Cody*, 405 US 504, 509, 92 S Ct 1048, 31 L Ed 2d 394 (1972)). Although civil commitment is not punitive, the loss of liberty is so significant that due process requires proof by clear and convincing evidence, rather than a preponderance of the evidence, before a person can be committed. *Addington*, 441 US at 433.

The record also permits us to assess the third factor that *Mathews* identified, "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 US at 335. The state argues that an in-person hearing affects three governmental interests: (1) the state's interest in providing care to its citizens and protecting the community from those who pose a danger to others; (2) the cost of transporting persons alleged to be mentally ill from the hospital to the courthouse or, alternatively, the cost of holding the hearing at the hospital; and (3) the state's interest in permitting psychologists and other medical personnel to devote their time to other persons who need their care. We consider each of those interests in turn.

As the state notes, the Court recognized in *Addington* that a state has an interest in caring for its citizens who are unable to care for themselves and in protecting the community from those who pose a danger to it. *See* 441 US at 426. As the Court also recognized, however, "the State has no interest in confining individuals involuntarily if they are not mentally ill or if they do not pose some danger to themselves or others." *Id.* In our view, the first interest the state identifies reduces to an interest in accurately determining the factual issues involved in a civil commitment hearing. In that respect, it anticipates the second *Mathews* factor and adds no independent weight to the state's interests.

The state identifies a second interest: the cost of transporting a person who allegedly is mentally ill from the hospital to the courthouse or, alternatively, the cost of requiring the judge and court staff to hold the hearing at the hospital. As the state notes, each alternative imposes a cost on the state. However, ORS 426.095(1) assumes those costs are an

inherent part of the system. Moreover, we held in *G. N.* that, despite the cost of transporting the person who allegedly was mentally ill to the courthouse, the trial court abused its discretion in requiring the person to appear remotely at his civil commitment hearing. 230 Or App at 255 (explaining that, in applying ORS 426.095(1), "[n]o reason was given why transporting appellant to the courthouse or making some other accommodation would have been inconvenient for the court").

We look to ORS 426.095(1), as interpreted in *G. N.*, not to show that it bars the Presiding Judge's order. Rather, we look to ORS 426.095(1) because it reflects the legislature's determination that the cost of either transporting a person who allegedly is mentally ill to the courthouse or of holding the hearing where the person is housed is an incidental cost of determining whether a person should be civilly committed; it is not a substantial burden on the state that justifies lesser procedural protections as a matter of due process.

Finally, the state relies on *Parham v. J. R.*, 442 US 584, 606, 99 S Ct 2493, 61 L Ed 2d 101 (1979), for the proposition that requiring psychologists and medical professionals to attend in-person hearings hampers their ability to provide medical services to other persons in their care. As we read *Parham*, that case provides less support for the state's position than it perceives. The question in *Parham* was what process is due when a parent voluntarily decides to commit a mentally ill child to a state hospital for care and treatment. *See id.* at 588-89. In those circumstances, the State of Georgia required a doctor to examine the child on admission to determine if the child had a mental illness that required hospitalization. *Id.* at 590-91. The state also required periodic follow-up examinations to determine if hospitalization remained appropriate. *Id.* at 591-93. The state, however, did not provide a pre- or post-admission hearing to review the parents' and doctor's joint decision to admit the child. *Id.* at 597.

In holding that no pre- or post-admission hearing was constitutionally required, the Court observed in *Parham* that, "[o]ne factor that must be considered is the utilization of the time of psychiatrists, psychologists, and other behavioral specialists in preparing for and participating in hearings rather than performing the tasks for which

their special training has fitted them." *Id.* at 605-06. One difficulty with the state's reliance on *Parham* is that the psychologists and medical professionals who testify in Oregon civil commitment hearings will have to spend time "preparing for and participating in [those] hearings" regardless of whether the hearings are remote or in person. *See id.*

The only time that remote commitment hearings save is the time it takes the medical professional to travel to the courthouse. Ordinarily, that will involve a relatively minimal time commitment.[10] Moreover, if the hearing is held at the hospital where the medical professional practices, then the only time that a remote hearing will save is the time it takes for the medical professionals to walk from their office to the hospital room where the in-person hearing is being held. The burden on the state that the Court noted in *Parham* is largely absent here. Considering the costs of holding an in-person hearing that the state has identified, we conclude that the incremental cost of such hearings is minimal at most.

That leaves the second factor that *Mathews* identified—"the risk of an erroneous deprivation of [a protected liberty] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." 424 US at 335. On that factor, the state argues that, in light of the other procedural protections available in civil commitment hearings, the "probable value" of an in-person hearing "is minimal." Appellant responds, as she did at trial, by asserting that remote hearings pose technological and other difficulties that create a constitutionally unacceptable risk of an erroneous deprivation of liberty.

The parties' disagreement turns on a factual issue—the extent to which a remote hearing provides the same or

---

[10] Sometimes, the time required to travel to a hearing may present a more substantial burden. Appellant, however, does not contend that due process requires that every witness testify in person at a civil commitment hearing. Rather, as we understand her position, if the Presiding Judge's March 11, 2022, order violates due process, then the order will have no effect, and the existing statutes governing remote testimony will apply. Specifically, if the March 11, 2022, order is invalid, then ORS 45.400 would permit a witness to testify remotely in a civil commitment hearing if the trial court determined, among other things, that the time or difficulty of traveling to the hearing presented an "undue hardship" or otherwise established "good cause" for testifying remotely. *See* ORS 45.400 (3)(b)(C), (E).

equivalent procedural protections as an in-person hearing. It may be, as the state argues, that any incremental value from an in-person hearing is "minimal." Alternatively, it may be, as appellant argues, that the deficits inherent in a remote hearing present an unacceptable risk of an erroneous deprivation while an in-person hearing provides a better opportunity for the trier of fact to make credibility determinations and the like. Certainly, custom and the legislature's assumption, reflected in ORS 426.095(1), that civil commitment hearings will be held in person provide some support for appellant's position. The record, however, contains no evidence one way or the other on those factual issues, much less a resolution of any competing evidence.

Perhaps we could resolve this case by determining which side had the burden of production and ruling against the side that failed to meet its burden. The trial court, however, did not hold a hearing on appellant's motion. Rather, it denied her motion the day after she filed it, based on the Presiding Judge's order. Appellant never had the opportunity to present any evidence to support her position, and the state, represented by the district attorney's office, took no position on her motion in the trial court. As a result, the state did not seek to either put on any evidence or put appellant to her proof. In these circumstances, we think that the better course is to remand this case for an evidentiary hearing on appellant's motion, primarily on the second *Mathews* factor.

As noted, the second *Mathews* factor turns on whether a remote hearing, using the technology available in this case, created the "risk of an erroneous deprivation" and conversely the value that an in-person hearing would add to reaching an accurate result. That is, in light of the factual issues that are at play in civil commitment hearings, how does an in-person hearing produce a more accurate answer than a remote hearing, and relatedly are there technological or other problems with the remote technology currently used by the court that create an unacceptable risk of an erroneous determination?

In answering that question, it is important to keep two principles in mind. First, the answer to the question does not turn on the particular facts of a specific case. Rather, as the Court explained in *Mathews*, "procedural due process

rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions." 424 US at 344 (discussing the second *Mathews* factor). As we understand *Mathews*, it sought to avoid announcing procedural rules that varied from one case to the next depending on each case's unique facts. Rather, the Court has sought to announce general due process rules subject to categorical exceptions. *See Wolff*, 418 US at 566 (providing that due process permits an inmate to call witnesses in a prison disciplinary proceeding unless "permitting him to do so will *** be unduly hazardous to institutional safety or correctional goals").[11]

Second, any deficit associated with a remote civil commitment hearing and any benefit from an in-person hearing are relevant to the second *Mathews* factor to the extent they increase or decrease the risk of an erroneous determination. *Heller v. Doe*, 509 US 312, 332, 113 S Ct 2637, 125 L Ed 2d 257 (1993) (concluding that, even if allowing parents and guardians to participate in a commitment proceeding increased the likelihood of commitment, those persons' participation in the hearing did not increase the risk of an inaccurate determination and thus did not bear on the second *Mathews* factor). As the Court explained in *Heller*, "[a]t least to the extent protected by the Due Process Clause, the interest of a person subject to governmental action is in the accurate determination of the matters before the court, not in a result more favorable to him." *Id.*

Once the parties have had an opportunity to present evidence and the trial court has resolved any disputed evidentiary issues, then it can balance the three *Mathews* factors and determine whether due process requires an in-person commitment hearing. We accordingly vacate the trial court's judgment and remand this case for further proceedings.

Judgment vacated; remanded for further proceedings.

---

[11] If, as the state argues, due process does not generally require in-person civil commitment hearings, technological problems in an individual case could still render the hearing fundamentally unfair. In that instance, the specific hearing presumably would violate due process even though the procedures, if they had worked, would have complied with it.